## IN THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY, MARYLAND

**DIANE S. ROSENBERG,** *et al.*
*as Substitute Trustees*

    *Plaintiff*

v.

**DONALD L. CHALK, JR.**
**TRACEY L. CHALK**

    *Defendants*　　　　　　　　　　**CASE NO. 02C13175010**

---

**TRACEY L. CHALK**
*On Behalf of a Class of Similar Persons*

    *Counter Plaintiffs*

v.

**LENDER PROCESSING SERVICES, INC.**
Serve On:
Todd C. Johnson
Executive Vice President and General
Counsel
Lender Processing Services, Inc.
601 Riverside Avenue
Jacksonville, FL  32204

    *Counter Defendant*

### CLASS ACTION COUNTER COMPLAINT

### &

### REQUEST FOR JURY TRIAL

Counter Plaintiff, Tracey L. Chalk ("Chalk"), individually and on behalf of all Maryland

residents similarly situated and by her attorneys Scott C. Borison, and Phillip R.

1

Robinson of the Legg Law Firm, LLC, sue Defendant Lender Processing Services, Inc. ("LPS") and states:

1. This case arises from Defendant LPS's systematic and intentional debt collection activities against Maryland consumers without the mandatory collection license required by the State of Maryland.

2. Defendant LPS allegedly acquires limited servicing or collection rights of consumer, mortgage debts in default and then proceeds to try to collect the debt on behalf of as a contracted service provider of national and regional mortgage servicers like PNC Bank, National Association ('PNC'). As part of its contractual services to national mortgage servicers, LPS (i) retains and/or directs a network of attorneys, law firms, and other service providers as part of debt collection practices throughout the State of Maryland to file foreclosure actions in Maryland courts and (ii) collecting payments directly or indirectly from the Plaintiff and putative class members. Since LPS does not have a mandatory collection agency license required by Maryland law, it does not have the right to directly or indirectly collect any sums from the Counter Plaintiff and the putative class members.

3. In a related matter before the United States District Court of Maryland, *Hauk v. LVNV Funding, LLC*, 749 F. Supp. 2d 358, 369 (D. Md. 2010), the Honorable Catherine C. Blake found that the Plaintiffs in that action were permitted to pursue claims against collection agency when it collected or attempted to collect upon debts "against...the putative class members [when the collection agency]...failed to become licensed as a 'collection agency" by the Maryland

Commissioner of Financial Regulation prior to [initiating collection activities], as required by Maryland law, Md. Code Ann., Bus. Reg. § 7–301."

4. In a follow-up to the *Hauk* decision, the Honorable Richard D. Bennett also concluded "that in failing to obtain a license and nevertheless [attempting] to collect debt, [the Debt Buyer] violated the [Fair Debt Collection Practices Act] and the respective state statutes." *Bradshaw v. Hilco Receivables, LLC*, 765 F. Supp. 2d 719, 724 (D. Md. 2011).

5. The non-partisan Government Accounting Office (GAO) recently summarized   public enforcement of this kind of scheme as follows:

> our analysis of information provided by the National Association of Attorneys General found at least 60 enforcement actions were taken by state attorneys general against debt collection companies from January 2006 through May 2009, of which 28 involved or may have involved the collection of credit card debt. These actions alleged a variety of illegal debt collection practices, such as deducting money from consumers' bank accounts without authorization, **operating in states without proper licenses**, and refusing or failing to provide consumers with proof of their debts. Generally, state attorneys general either negotiated a settlement with the debt collection company or brought a court action against the company. Settlements included penalties such as refunds to consumers, cancellation of consumers' debts, civil penalties, and injunctive relief aimed at preventing future collection violations.

> GAO Report, Fair Debt Collection Practices Act Could Better Reflect the Evolving Debt Collection   Marketplace and Use of Technology, September 2009 (available at http://www.gao.gov/new.items/d09748.pdf) at Pages 38-39 (emphasis added).

### JURISDICTION AND VENUE

6. This Court has jurisdiction asserted herein for the following reasons:

    a. The Maryland Rules expressly provide that a party in a civil action in this Court may bring a Counter Complaint (Rule 2-331);

3

b.  The Maryland Rules expressly provide that a Counter Plaintiff may add additional parties as Counter Defendants if they are not already parties to the action (Rule 2-331 (c));

c.  The Maryland Rules specifically state that "Title 2 [of the Maryland Rules] applies to civil matters in the circuit courts" (Rule 1-101(b));

d.  The Maryland Court of Appeals has expressly held that a party is permitted to file a counter complaint in a foreclosure action such as this action (see *Fairfax Sav., F.S.B. v. Kris Jen Ltd. Partnership,* 338 Md. 1,21 (1995));

e.  This Court has jurisdiction asserted because the Counter Defendant transacts business and performs work and services in Maryland and has availed itself to the jurisdiction of this Court through its appointed agents, the Plaintiffs and the firm of Shapiro & Burson LLP, in this Court.

f.  Declaratory and injunctive relief are available pursuant to Md. Code Ann., §§3-401-3-415.

7.  This Court also has jurisdiction as to LPS pursuant to Md. Code Ann., Cts. & Jud. Proc. § 6-103. Specifically, LPS utilized, directly and indirectly, different signers to knowingly and willingly acted as a professional witnesses by providing affidavit testimony to this Court and other courts of this state as part of its business services (i.e. the debt collection practices through foreclosure litigation) which as alleged herein has caused injury to the Plaintiff and putative class members.

8.  Venue is appropriate in this Court because the Counter Defendant has

4

conducted, directly and indirectly, business within Anne Arundel County, Maryland and because the conduct complained of occurred in Anne Arundel County, Maryland.

## PARTIES

9. Counter Plaintiff Tracey Chalk is a Maryland resident.  She resides at 634 Shore Road in Severna Park, Maryland (21146)("Chalk Property").  Chalk is the record owner of the Chalk Property.

10. Counter Defendant Lender Processing Services, Inc. is a Delaware corporation. It does business throughout Maryland.   During the operative period, LPS' actions directly and indirectly through its affiliates LPS Default Solutions Inc. ("LPSDS") a Delaware Corporation and DocX, LLC a Georgia Limited Liability Company..

11. Not named as party in this Counter Complaint PNC Bank, National Association is a national mortgage servicer which has retained LPS as an authorized service provider in collecting debts through foreclosure.

12. Not named as a party in this Counter Complaint, Rosenberg & Associates is a Maryland law firm which employs the Plaintiffs in this action and also acts upon the direction of LPS.

13. Not named as a party in this Counter Complaint, Shapiro & Burson is former Virginia law firm working in Maryland and also acts upon the direction of LPS.

## FACTS

14. On or about February 13, 2013, the Circuit Court for Baltimore City, Maryland approved a Consent Judgment entered into between LPS and the Consumer

Protection Division of the Office of Attorney General for the State of Maryland ("CPD"). *See Consumer Protection Division Office of The Attorney General v. Lender Processing Services, Inc. A Delaware Corp., Case No.* 24-C-13000613, (Cir. for Balt. City; filed Jan. 31, 2013)(consent judgment referred to herein after as "CPD-LPS Consent Order").   In the Consent Judgment, LPS and CPD entered into the following stipulated facts:

    a.  During a period from at least January 1, 2008, to December 31, 2010, certain Servicers authorized specific persons employed by certain subsidiaries of Lender Processing Services, Inc., to sign Mortgage Loan Documents or assist with the execution of Mortgage Loan Documents on their behalf.

    b.  Some Mortgage Loan Documents generated and/or executed by certain subsidiaries of Lender Processing Services, Inc., on behalf of Servicers contain defects including, but not limited to, unauthorized signatures, improper notarizations, or attestations of facts not personally known to or verified by the affiant. Some of these Mortgage Loan Documents may contain unauthorized signatures or may contain inaccurate information relating to the identity, location, or legal authority of the signatory, assignee, or beneficiary or to the effective date of the assignment.

    c.  Certain subsidiaries of Lender Processing Services, Inc., recorded or caused to be recorded Mortgage Loan Documents with these defects in local land records offices or executed or facilitated execution on behalf of the Servicers knowing some of these Mortgage Loan Documents would

be filed in state courts or used to comply with statutory, non-judicial foreclosure processes.

d. At some time prior to November 1, 2009, employees and agents of DocX, LLC ("DocX") a wholly owned, indirect subsidiary of Lender Processing Services, Inc., were directed by management of DocX to initiate and implement a program under which some DocX employees signed Mortgage Loan Documents in the name of other DocX employees, who were or had been at one time authorized to sign on behalf of Servicers. DocX referred to these unauthorized signers as "Surrogate Signers."

e. At the time the Surrogate Signers signed certain Mortgage Loan Documents, they were not authorized by the applicable Servicer to sign their own names or the names of those persons who had purportedly been authorized by the Servicer to sign the Mortgage Loan Documents in question.

f. The Surrogate Signers executed certain Mortgage Loan Documents in the name of other DocX employees without indicating that the documents had been signed by a Surrogate Signer.

g. Notaries public employed by DocX or as agents of DocX completed the notarial statements on the Mortgage Loan Documents that were executed by Surrogate Signers and stated that those documents had been properly acknowledged, signed, and affirmed in their presence by the person whose name appeared on the document when in fact the

7

Surrogate Signer had signed the name of another person or signed outside the presence of the notary, or both.

h. DocX presented and recorded certain Mortgage Loan Documents with local land records offices knowing they had been executed by Surrogate Signers.

i. On or around November 2009, Lender Processing Services, Inc. conducted an internal review of DocX and identified certain Mortgage Loan Documents that contained inaccuracies, unauthorized signatures, notarization defects, or other deficiencies. Lender Processing Services, Inc. has also identified certain other defects and deficiencies in the Mortgage Loan Documents executed by some of its other subsidiaries. Such past practices, when discovered by Lender Processing Services, Inc. management, were discontinued.

j. On April 13, 2011, LPS entered into a Consent Order with Federal Banking Agencies, which order contains similar allegations of deficiencies in Mortgage Loan Document execution practices at certain subsidiaries of LPS and management oversight of these practices. Pursuant to the Consent Order, LPS has agreed to take further remedial action, including, but not limited to, proposing a plan to enhance internal auditing and risk management, adopting a comprehensive compliance program for activities relating to default management services, and retaining an independent consultant to conduct an independent review of LPS' document execution services occurring between January 1, 2008,

and December 31, 2010, to determine the existence and extent of the deficiencies and to assess LPS' ability to identify affected Mortgage Loan Documents, to remediate the deficiencies, as appropriate, and to assess whether any financial injury to Servicers or borrowers resulted from the document execution services described herein...

15. LPS admits on its website that it "is a leading provider of mortgage and consumer loan processing services, mortgage settlement services, default solutions and loan performance analytics, as well as solutions for the real estate industry, capital markets investors and government offices."    See http://www.lpsvcs.com/LPSCorporateInformation/AboutUs/Pages/default.aspx

16. In its February 29, 2012 10K filed with the United States Securities and Exchange Commission, LPS made the following representations and admissions:

> a. "Our default management services, including title, posting and publication, property preservation, asset management services and administrative support, are provided to national lenders, loan servicers and other real estate professionals to enable them to better manage some or all of the business processes necessary to take a loan and the underlying property through the default, foreclosure and disposition process. Our revenues from our Loan Transaction Services segment in 2011 were $1,355.5 million, or approximately 65%, of our consolidated revenues from continuing operations. In 2011, 2010 and 2009, all of our revenues were from sources within the U.S. and Puerto Rico." Pages 2-

9

3.

b.   "In addition to loan facilitation services, our Loan Transaction Services
     segment offers default management services. These services allow our
     customers to efficiently manage the business processes necessary to
     take a loan and the underlying real estate securing the loan through the
     default and foreclosure process. We offer a full spectrum of services
     relating to the management of defaulted loans, from initial property
     inspection through the eventual disposition of our customer's asset.
     Based on a customer's needs, our default management services can be
     provided individually or, more commonly, as part of a solution that
     integrates one or more of those services with our technology
     applications, such as the Desktop application." Page 4.

c.   "We offer lenders, servicers and their attorneys certain administrative
     and support services in connection with managing foreclosures."  Page
     4.

d.   "[V]arious pieces of government legislation aimed at mitigating the
     current downturn in the housing market and lenders' efforts to comply
     with the requirements of that legislation and the requirements of consent
     orders entered into by a number of large lenders during 2011 have
     delayed foreclosure starts and slowed the pace at which foreclosures are
     processed, which has adversely affected the results of our default
     management operations." Page 8.

e.   "Our customers also have significant relationships with Fannie Mae and

Freddie Mac, which are government-sponsored enterprises ("GSE") tasked with working with financial institutions to provide liquidity to the mortgage market. They do this by purchasing loans from the lenders either for cash or in exchange for a mortgage-backed security that comprises those loans and that, for a fee, carries the GSE's guarantee of timely payment of interest and principal. Because our customers service the loans owned by the GSEs, we provide services on many of those loans. As a result of these relationships, the GSEs have been able to implement changes to our pricing structure on certain services we provide related to default and foreclosure servicing." Page 9.

    f.   "Our Technology, Data and Analytics segment principally includes...our mortgage processing services, which we conduct using our mortgage servicing platform and our team of experienced support personnel." Page 18.

17. LPS collects on defaulted consumer debts in the State of Maryland, directly and indirectly through its affiliates including Rosenberg & Associates, Shapiro & Burson, DocX, and LPSDS for the benefit of its affiliated mortgage services such as PNC and mortgage owners such as Freddie Mac. One hundred percent of the consumer debts for which LPS performs collection activities are debts that are in default at the time LPS performs services.

18. LPS's services are subject to a "Default Services Agreeemnt" or DSA between it and various mortgage servicers including PNC.

19. LPS uses the mails and telephone system in conducting its business.

11

20. LPS regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

21. LPS is also not licensed as a Maryland mortgage lender as disclosed on the Nationwide Mortgage Licensing System and Registry.   However, it is now conducting collection activities, directly or indirectly, related to more than fifty Maryland residential, mortgage loans including that of the Counter Plaintiff and other Maryland consumers.

22. LPS has never held a license to act as a debt collection agency in the State of Maryland when it sought, directly or indirectly, to collect against the Counter Plaintiff or class members.   The use of LPS or its subsidiaries, DocX, and LPSDS, to engage in illegal activities is beyond the purposes for which each are permitted to operate as a separate legal entity and therefore LPS is not a separate legal entity.  LPS is liable for the acts of DocX, and LPSDS.

23. LPS is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(4)(6) since it is a business engaged in collecting on defaulted debts by using interstate wires and mail among other acts.  *See also, Schlosser v. Fairbanks Capital Corp.,* 323 F.3d 534, 536 (7th Cir. 2003) (the FDCPA "treats assignees as debt collectors if the debt sought to be collected was in default when acquired by the assignee, and as creditors if it was not. *See Bailey v. Security Nat'l Servicing Corp.,* 154 F.3d 384, 387 (7th Cir.1998); *Whitaker v. Ameritech Corp.,* 129 F.3d 952, 958 (7th Cir.1997); *see also Pollice v. Nat'l Tax Funding, L.P.,* 225 F.3d 379, 403-04 (3d Cir.2000); *Wadlington v. Credit Acceptance Corp.,* 76 F.3d 103, 106-07 (6th Cir.1996); *Perry v. Stewart Title Co.,* 756 F.2d 1197, 1208

(5th Cir.1985)").

24. LPS also acts as a "collection agency" as defined by Maryland Collection Agency Licensing Act, MD. ANN. CODE, BUS. REG. ART., § 7-101, et seq. ("MCALA").  However, it does not now nor at any time in the past ever had a collection agency license as required by MCALA.

25. Upon information and belief and according to public records, LPS has acted directly as "debt collector" under the FDCPA in more than 50 occurrences in the State of Maryland in the three years by attempting to collect debts against Maryland consumers through foreclosure, collection actions filed in Maryland state courts and Maryland land records as well as claims reported to the U.S. Bankruptcy Court for Maryland.

26. Upon information and belief, since DocX, and LPSDS are wholly-owned subsidiaries of LPS, LPS has indirectly attempted and/or actually collected in the same number of occurrences by indirectly collecting through DocX, and LPSDS.

27. As part of its routine and on-going collection practices LPS collects or attempts to collect sums through foreclosure fees assessed to the mortgage accounts by the Plaintiff and class members through the mails and interstate wires.  LPS also collects through civil litigation in Maryland Courts filed as foreclosure actions by various trustees including those from Rosenberg & Associates and Shapiro & Burson.

28. As part of its routine and on-going collection practices, LPS before the Consent Order offered financial incentives to its network of trustees and attorneys depending on the speed in which they accomplished their assigned work from

LPS.

29. Under MD. ANN. CODE, BUS. REG. § 7-301, a person must have a license to do

business as a collection agency in the State of Maryland.

30. The Maryland Commissioner of Financial Regulation has clearly stated the

state regulator's position regarding the legal requirements under Maryland

law for a person who acquires consumer debt after default and files lawsuits in

Maryland to collect the debt:[1]

> ... 4. The position of the Agency is that, unless otherwise exempt, a
> person who brings actions in Maryland State courts to collect consumer
> claims which were acquired when the claims were in default is
> knowingly and willfully doing business as a "collection agency" in the
> State under [Bus. Reg.] § 7-101(c). This includes, but is not limited to, the
> named Plaintiffs in such judicial actions, which will normally be the owners
> of the consumer debt.
>
> 5. Thus the Agency's position is that a Plaintiff in a Maryland State
> court action brought to collect a consumer claim which was acquired
> when the claim was in default is required to be licensed as a collection
> agency under MCALA, and is subject to the regulatory authority of the
> Agency in the conduct of that litigation.
>
> 6. The position of the Agency is that a person who brings judicial actions in
> Maryland State courts to collect consumer claims which were acquired
> when the claims were in default also meet the definition of "collector"
> under CL § 14-201(b) of the Maryland Consumer Debt Collection Act
> ("MCDCA," at Commercial Law Article ("CL"), § 14-201 et seq.,
> Annotated Code of Maryland) and of "debt collector" under 15 U.S.C. §
> 1692(a) of the Fair Debt Collection Practices Act ("FDCPA," at 15
> U.S.C. § 1692, et seq.). ...

31. Every collection effort in Maryland by LPS without a Collection Agency license,

including each and every foreclosure action filed in Maryland courts with its direct

and indirect assistance is an unfair or deceptive trade practice since these actions

---

[1] *In the Matter of: Midland Funding, LLC, et al.,* Before the Maryland State
Collection Agency, Licensing Board in the Office of the Commissioner of
Financial Regulation, DFR-FY-2010-063.

were committed without the right to do so as stated by the legislature.

32. LPS acted as a debt collection agency in Maryland including various collection activities and attempts to obtain judgments in Maryland courts against the class members.

33. Defendant's actions as a debt collection agency against Counter Plaintiff and all class members were done without a mandatory, state license as a "collection agency" by the Maryland Commissioner of Financial Regulation.

34. Before the 2007 session of the Maryland General Assembly, certain entities like LPS sought to avoid Maryland statutes and regulation by asserting that they were not subject to Maryland statues addressing collection agencies. *See,* Legislative History for 2007 chap. 472 (Bus. Reg. 7-101) HB 1324. As a result the 2007 General Assembly required LPS and other debt buyers to acquire a license by October 1, 2007. *Id.*

35. Then Maryland Commissioner of Financial Regulation, Charles W. Turnbaugh, Commission of Financial Regulation explained the purpose of the bill, HB 1324, at the time as follows:

> ... The law does not require licensing for businesses that only collect their **own** consumer debts, unless the business uses a name or other artifice that indicates that another party is attempting to collect the consumer debt. However, the evolution of the debt collection industry has created a "loophole" used by some entities as a means to circumvent current State collection agency laws. Entities, such as "debt purchasers" who enter into purchase agreements to collect delinquent consumer debt rather than acting as an agent for the original creditor, currently collect consumer debt in the State without complying with any licensing or bonding requirement. The federal government has recognized and defined debt purchasers as collection agencies, and requires that these entities fully comply with the Federal Fair Debt Collection Practices Act. **This legislation would include debt purchasers within the**

>    definition of a "collection agency," and require them to be
>    licensed by the Board before they may collect consumer
>    claims in this State ... *[emphasis added]*.

30. In sworn testimony before the U.S. District Court of Maryland, Kelly Mack from

    the Maryland Department of Labor, Licensing, and Regulation has testified that

    "[i]t has been the consistent position of the [Maryland State Collection Agency]

    Board that a Consumer Debt Purchaser (i.e., a person who acquires consumer

    claims which are in default at the time of the acquisition) that collects consumer

    claims through litigation is a 'collection agency' under Maryland law and is

    required to be licensed as such, regardless of whether an attorney representing

    the Consumer Debt Purchaser in the litigation is a licensed collection agency."

36. Following enactment of HB 1324 the Maryland Commissioner of Financial

    Regulation issued its <u>official</u> position as DLLR Advisory Notice No. 07-06

    ("Advisory"). The Advisory clearly stated the Commissioner's official position on

    the changes to MCALA: that is "... effective October 1, 2007 any person

    engaged in the collection of a consumer claim the person owns, if the claim was

    in default when the person acquired it, is required to be licensed as a collection

    agency pursuant to HB 1324 ...".

37. LPS willfully and knowingly sought to directly or indirectly collect debts

    allegedly acquired in default and, therefore, acted as a debt collection agency in

    Maryland without a license.

38. Before entering into the CPD-LPS Consent Order, upon information and belief,

    LPS:

    a. Instructed its affiliated Maryland Trustees, including those employed by

16

Shapiro & Burson and Rosenberg & Associates to perform certain tasks related to debt collection activities in Maryland and federal courts in Maryland;

b. Entered into standard DSA form contracts which contained standard language, definitions, terms, and conditions.

c. Required mortgage servicers like PNC to utilize an LPS' affiliated attorney such as Shapiro & Burson and Rosenberg & Associates.

d. Represented to mortgage servicers like PNC that LPS would provide "legal services" for the servicer including those related to "mortgage foreclosures, bankruptcies and other loan default services."

e. Managed and retained its network attorneys such as Shapiro & Burson and Rosenberg & Associates in accordance with the DSA and did not permit its attorneys to have direct communications with the mortgage servicers.

f. Earned most if not all of its income from the fees paid to its network firms including Shapiro & Burson and Rosenberg & Associates. These fees were described by LPS as "Administrative Fees" so as not to appear to be an impermissible fee sharing or referral arrangement.

g. Held itself out as an "agent" of the mortgage servicer client including PNC and the owner of the mortgage loans.

39. Named Counter Plaintiff's belief of the facts contained in the proceeding paragraph is based upon the terms and conditions of the CPD-LPS Consent Order and other public filings involving LPS and its affiliates and the sworn

17

testimony of Mark D. Meyer on January 29, 2013 in the U.S. District Court of Maryland about LPS role in the commencement of this action.

## FACTUAL ALLEGATIONS RELATING TO THE NAMED COUNTER PLAINTIFF

40. Ms. Chalk, with her then husband Donald L. Chalk, acquired her ownership in her home nearly 15 years ago.  Ms. Chalk has raised her family, including her two daughters and one son, in the home.

41. Like thousands of other Maryland homeowners, Ms. Chalk has had difficulty maintain the mortgage originally taken out by her former husband, Donald Chalk, on or about May 18, 2005 with National City Mortgage a division of National City Bank of Indiana.

42. As security for the May 18, 2005 loan, Ms. Chalk signed the Deed of Trust presented to her by National City's representative at the settlement since she was on title to the property—even though she was not the then borrower.  That Deed of Trust was recorded in the land records for Anne Arundel County at Book 16351, Page 509 ("National City Deed of Trust"). .

43. On or about February 13, 2009 and March 1, 2009, Ms. Chalk and her then husband entered into a loan modification with National City.  Ms. Chalk was not provided any disclosures relating to the loan modification as required by various federal laws including the Truth in Lending Act. However, due to personal issues and because her husband ceased all support for Ms. Chalk and the children, Ms. Chalk could not afford the monthly payments.   Further, Donald Chalk abandoned the family and any meaningful interest in the Chalk Property.

44. After she fell behind, Ms. Chalk received a Notice of Intentional to Foreclose ('NOITF") from Shapiro on or about March 31, 2010 which failed to provide the identity of the secured party or alternatively the identities of all secured parties and represented that PNC was the only secured party of the subject loan.  PNC was also identified as the servicer on the Shapiro NOITF.

45. Without the procedural right to do so, since the NOITF sent to her was deficient or misleading by failing to identify the true secured party/owner of the subject loan, PNC or alternatively the identity of all secured parties, upon information and belief LPS acting as PNC's authorized agent instructed Shapiro & Burson to commence foreclosure proceedings against the Ms. Chalk and her home on or about May 20, 2010.  *See Burson v. Chalk*, Cir. Ct. for Anne Arundel County, Maryland, Case No. 02-C-10152349 ("*Burson v. Chalk* Action").    This belief is based upon the sworn testimony of Mark D. Meyer on January 29, 2013 in the U.S. District Court of Maryland about LPS role in the commencement of this action.

46. As part of the Order to Docket package filed on behalf of PNC by Shapiro, PNC's authority and involvement in the collection effort through foreclosure by its (i) Affidavit Certifying Ownership of Debt Instrument and that Copy of Note is a True and Accurate Copy and (ii) Statement of Debt.

47. Ms. Chalk did not present any defenses to the *Burson v. Chalk* Action, no findings of fact were ever determined in the *Burson v. Chalk* Action and no judgment in favor of any party was entered by the Court in the *Burson v. Chalk* Action.

19

48. On or about March 3, 2011, Shapiro moved to dismiss the *Burson v. Chalk* Action without prejudice but it still remains part of the public records even though PNC had no legal right to have filed the action in the first instance since the NOITF failed to comply with the statutory requirements since it did not disclose the identity of Freddie Mac as either the sole or another secured party/owner of the subject loan. Further, upon information and belief, LPS and PNC contend that Ms. Chalk is responsible for costs and fees associated with the *Burson v. Chalk* Action.

49. On or about August 17, 2011, Ms. Chalk received another NOITF from Rosenberg & Associates which represented that PNC was the secured party of the subject loan when in fact Freddie Mac is the owner of the loan and should have been listed as the secured party or alternatively, should have included Freddie Mac as an additional secured party.   PNC was also identified as the servicer on the first Rosenberg NOITF.

50. On or about October 8, 2011, PNC falsely represented to Ms. Chalk on a telephone call that it had scheduled a foreclosure sale of her home and property for November, 2011. In reliance to the false representation, Ms. Chalk incurred legal fees to inquire about the legality of conducting a foreclosure sale when no new Order to Docket or even a Complaint to Foreclose has been filed in any court against her as of the filing of this complaint.

51. On or about October 13, 2011, Ms. Chalk received another NOITF from Rosenberg which represented that PNC was the secured party of the subject loan when in fact Freddie Mac is the owner of the loan when in fact Freddie Mac

20

is the owner of the loan and should have been listed as the secured party or alternatively, should have included Freddie Mac as an additional secured party. PNC was also identified as the servicer on the second Rosenberg NOITF.

52. On June 13, 2012 LPS instructed Rosenburg & Associates to commence this action.  This fact is based upon the sworn testimony of Mark D. Meyer on January 29, 2013 in the U.S. District Court of Maryland about LPS role in the commencement of this action.

53. On or about June 25, 2012, Ms. Chalk received another NOITF from Rosenberg which represented that PNC was the only secured party of the subject loan when in fact Freddie Mac is the owner of the loan and should have been listed as the secured party or alternatively, should have included Freddie Mac as an additional secured party.   PNC was also identified as the servicer on the third Rosenberg NOITF.

54. The Plaintiffs' initiated this action on January 8, 2013.  Included with their papers initiating this action, the Plaintiffs included certain knowing and false papers and documents including:

    a. The purportedly "true and accurate" copy of the Chalk mortgage Note is not a copy of the actual Chalk mortgage note.  This conclusion is based upon the sworn testimony of Robert Scott on January 29, 2013 in the U.S. District Court of Maryland prior to January 13, 2013.

    b. PNC's sworn testimony to this Court concerning the "true and accurate" copy of the Chalk Note is contrary to PNC's representations to the U.S. District Court of Maryland.

55. In reliance to Rosenberg & Associates' representations on behalf of LPS and PNC and for the purpose of mitigating her situation in good faith, Ms. Chalk contacted PHC on January 16, 2013 to learn more about Freddie Mac's REO Rental Initiative and how to apply for the program.  Ms. Chalk first contacted the PNC customer service department (at <u>1-800-822-5626</u>) and was then transferred to PNC's collections department <u>(at 1-800-523-8654</u>).  At 5pm on January 16, 2013, PNC's representative (i.e. "Danny L.") explained he had no information about Freddie Mac's REO Rental Initiative but directed her to visit the following website: www.realtyservices.pnc.com. A review of that website provided Ms. Chalk no information about Freddie Mac's REO Rental Initiative.

56. In further reliance to Rosenberg & Associates' representations on behalf of LPS and PNC, Ms. Chalk called PNC again on January 16, 2013 at about 7:15PM to learn about Freddie Mac's REO Rental Initiative but was told by Mark that he did not know and she would have to call another department.

57. Ms. Chalk has been damaged by the actions of LPS and its authorized agents by commencing two foreclosure actions before complying with Maryland law, against her and the property, i.e. the *Burson v. Chalk* Action and *Rosenberg v. Chalk,* to which it did not have the legal right to have commenced.  Both actions are part of the public records and therefore are available to anyone performing a credit search of Ms. Chalk's credit for the rest of her life.

58. In addition, PNC's actions have cost her legal fees and expenses related to the *Shapiro v. Chalk Action* foreclosure action and to respond to the unfair and deceptive threats to foreclosure without the right to mediation, and caused

emotional damages due to stress and other physical manifestations including worry, anxiety, fear, and sleeplessness.

59. Upon information and belief, LPS and its privies have also charged Ms. Chalk's mortgage account with fees and charges related to the improper foreclosure actions filed against her. These fees were disguised as Administrative Fees and were made to appear as legal fees charged by Shapiro & Burson and/or Rosenberg & Associates.

60. No reasonable person, including Ms. Chalk, would believe that businesses like PNC would utilize unlicensed mortgage servicers and collection agencies to perform their work.

## CLASS ALLEGATIONS

61. Counter Plaintiff brings this complaint on behalf of a class of all other persons similarly situated to her.

62. The class is comprised of all persons in the State of Maryland, who within three years prior to the filing of the initial complaint were contacted by the Counter Defendant, directly or indirectly, in connection with any effort to collect a debt which the Defendant acquired certain collection rights when that debt was in default.

63. This is a matter in which the one year FDCPA statute of limitations may be enlarged because the Counter Defendant effectively and intentionally concealed information which would have made its improper and illegal activities discoverable. The concealment was accomplished by failing to disclose facts about its legal status and other means until the sworn testimony of Mark D.

Meyer on January 29, 2013 in the U.S. District Court of Maryland about LPS role in the commencement of this action was made public.

64. The Named Counter Plaintiff and Class members had no reason to know of the true illegal nature of the illegal acts of the Counter Defendant until January 29, 2013 since the Counter Defendant routinely omits or misrepresents certain information from the class members concerning the illegal nature of how the Defendants collected defaulted consumer debts in the State of Maryland.

65. This case is one of those rare instances where circumstances external to the conduct of the Named Counter Plaintiff and class members which warrant a finding that it would be unconscionable to enforce the various limitations periods against the class members since such an act would create a gross injustice of allowing the Defendants to wrongfully and unjustly enriched to the detriment of the class in total sum of millions of dollars.

66. Counter Plaintiff estimates the class to consist of more than 50 persons.  This belief is solely upon a review of public records and could actually be substantially more people based upon the electronic records of the Counter Defendant concerning those residential mortgage accounts it acquired, directly or indirectly, related to Maryland properties.

67. The class is so numerous as to make it impracticable to join all members of the class.

68. There are questions of law and fact which are common to all members of the class, including:

    a. Whether LPS has acted as a debt collection agency in the State of

24

Maryland;

b. Whether LPS was licensed to act as a debt collection agency in Maryland at the times relevant to this complaint;

c. Whether LPS failed to provide notices required by the Fair Debt Collection Protection Act;

d. Whether LPS threatened or took actions that neither had a right to take under federal law;

e. Whether LPS is personally liable as a matter of law to the illegal acts of DocX, and LPSDS when each acted on behalf of and for LPS; and

f. Whether DocX, and LPSDS can be treated as a separate legal entities since each were used for illegal activities.

69. The only individual questions concern the identification of class members and who are entitled to any funds that the Defendants are ordered to disgorge as the fruit of its unlawful activities or share in any statutory or other damages permitted by law. This information can be determined by a ministerial examination of public records in various court houses or from the Defendants' business records or other sources, which are admissible as an exception to the hearsay rule and as an admission by a party.

70. Counter Plaintiff's claims are typical of the claims of the class members.

71. Counter Plaintiff will fairly and adequately protect the interests of all class members in the prosecution of this action. She is similarly situated with, and has suffered similar injuries as, the members of the class she seeks to represent. She feels that she has been wronged, wishes to obtain redress of the wrong,

and wants Defendant stopped from perpetrating similar wrongs on others.

72. To that end, Counter Plaintiff has retained counsel experienced in handling class action suits involving unfair or deceptive business practices that harm consumers.

73. Neither the Named Counter Plaintiff nor her counsel have any adverse interest which might cause them not to vigorously pursue this action.

74. Defendant LPS, by acting as a debt collection agency without a license has acted on grounds generally applicable to the class.


## COUNT I

### (Class Declaratory Judgment And Injunctive Relief)

75. Counter Plaintiff incorporates the foregoing allegations.

76. Plaintiff seeks a declaration on her behalf and on behalf of the class that the Defendant LPS has acted unlawfully by acting as a collection agency in the State of Maryland without a license to do so.

77. Defendant should be ordered to disgorge all amounts that it has obtained while acting illegally as a collection agency without a license in the State of Maryland.

78. Defendant should be enjoined from continuing to operate illegally without a license.

WHEREFORE, Counter Plaintiff and Class Members pray that this court:

a.       Certify this case as a class action with the named counter plaintiff as class representative and her attorneys as counsel on behalf of the

class described herein;

b.     Order appropriate injunctive relief to prevent further violations of law, including a preliminary and permanent injunction;

c.     Order LPS to disgorge all amounts collected from the class while the defendant acted as a debt collection agency without a license;

d.     Award reasonable attorney's fees, litigation expenses and costs;

e.     Order appropriate declaratory relief; and

f.     Provide such other or further relief as the Court deems appropriate.

### COUNT II

### (Class and Individual Claims for Violation of the Fair Debt Collections Act)

79. Counter Plaintiff incorporates the foregoing allegations.

80. The Defendant has violated the FDCPA by acting as a debt collector when it does not hold a license as a collection agency in the State of Maryland to do so as required under MCALA in material violation of 15 U.S.C. § 1692e(5) and other provisions of the FDCPA.

81. The practice of operating illegally without a mandatory license which also carries a criminal penalty, is an unfair or deceptive practice in violation of 15 U.S.C. § 1692f.

82. LPS status as an unlicensed debt collection is a material violation of the FDCPA since it is a material violation of a law designed to protect consumers from improper collection activities and no reasonable

person, including the Counter Plaintiff and each class member, in the State of Maryland would have considered it possible that the Defendant would subject itself to the criminal penalties of the Maryland law while collecting on consumer debts.

83. The FDCPA provides for statutory damages in addition to actual damages.

84. The Counter Plaintiff and Class are entitled to actual and statutory damages from the Defendant.

WHEREFORE, Counter Plaintiff prays that the Court enter judgment against LPS for the following:

    a.        Certify this case as a class action with the named plaintiff as class representative and her attorneys as counsel on behalf of the class described herein;

    b.        Award Actual Damages in a sum of no less than $5,000,000.

    c.        Award Statutory damages in the amounts allowed by the FDCPA equal to $500,000.00;

    d.        Award reasonable attorney's fees, litigation expenses and costs; and

    e.        Provide such other or further relief as the Court deems appropriate.

## COUNT III: MARYLAND MORTGAGE FRAUD PROTECTION ACT
### (INDIVIDUAL AND CLASS CLAIM)

85. Counter Plaintiff incorporates the foregoing allegations.

86. The Maryland Mortgage Fraud Protection Act, § 7-401 MD. REAL PROP., *et seq.* ("MMFPC") governs the relationship between the Defendant and the Plaintiff and class members.

87. MD ANN. CODE., REAL PROP. § 7-401 (c) provides: "Homeowner" means a record owner of residential real property. The Named Plaintiff and Class Members are record owners of the residential properties in question and therefore are Homeowners.

88. MD ANN. CODE., REAL PROP. § 7-401 (e) provides "Mortgage lending process...includes [t]he solicitation, application, origination, negotiation, servicing, underwriting, signing, closing and funding of a mortgage loan."

89. MD ANN. CODE., FINANCIAL INSTITUTIONS CODE. § 11-501 (k)(1) provides: "Mortgage loan" means any loan or other extension of credit that is: (i) Secured, in whole or in part, by any interest in residential real property in Maryland; and (ii) If for personal, household or family purposes, in any amount."

90. The MMFPC works to protect Homeowners' interests from misstatements, misrepresentations and omissions by LPS and ensure a level, fair playing field between borrowers and professionals.

91. The Named Counter Plaintiff and other Class Members were or are homeowners in the Mortgage Lending Process as defined by the MMFPC

29

since the actions in dispute in this lawsuit involve the servicing of residential mortgage loans.

92. MD ANN. CODE., REAL PROP. § 7-401 (d) provides: "Mortgage fraud" means any action by a person made with the intent to defraud that involves:

> 1. Knowingly making any deliberate misstatement, misrepresentation or omission during the mortgage lending process with the intent that the misstatement, misrepresentation or omission be relied on by a mortgage lender, borrower or any other party to the mortgage lending process;
> 2. Knowingly using or facilitating the use of any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process....
> 4. Conspiring to violate any provisions of item of (1), [or] (2)...of this section...

93. LPS has committed Mortgage Fraud by knowingly making, as described herein, deliberate misstatements, misrepresentations and omissions during the mortgage lending process concerning their right under Maryland law to collect mortgage payments from the Counter Plaintiff and Class Members, directly or indirectly, when it did not have the mandatory license to do so under Maryland law. The Defendant has also committed Mortgage Fraud by threatening foreclosure actions against the Counter Plaintiff and Class Members without the legal right to do so since its interest in the subject mortgage loan was not properly disclosed on any NOITF to the Named Counter Plaintiff or any class member and no Maryland court of equity can help aid a party with unclean hands.

94. Counter Plaintiff and the Class Members have been damaged by the Defendant's deliberate misstatements, misrepresentations, and omissions during the mortgage lending process concerning LPS' collection of mortgage loan payments through foreclosure from the Counter Plaintiff and Class Members without the right to do so.

WHEREFORE, Counter Plaintiff prays that the Court enter judgment against LPS for the following:

   a. Certify this case as a class action with the Counter Plaintiff as class representatives and her attorneys as counsel on behalf of the class members described herein;

   b. She be awarded as part of this claim $10,000 which represents her compensatory damages as a result of the Defendant's illegal practices and misrepresentations;

   c. The class be awarded as part of this claim $5,000,000 plus treble damages for Defendant's knowing and willful violations of Maryland law, subject to amendment, which represents the compensatory damages for the class;

   d. She be awarded her reasonable attorney's fees and costs; and that her claim should include such other and further relief as the Court deems just and proper.

### COUNT IV:  UNJUST ENRICHMENT
### (INDIVIDUAL AND CLASS CLAIM)

95. Counter Plaintiff incorporates the foregoing allegations.

31

96. LPS is not and was not entitled to receive any benefit or payments from Counter Plaintiff and Class Members as a result of the collection actions they pursued directly and indirectly against the counter Plaintiffs and Class Members because it did not have the legal right or legal standing to have even initiated the collection efforts in the first instance.

97. Defendant has known or should have known since 2007 that it was required to have a license to act as a collection agency in the State of Maryland and it failed to obtain a license to act as collection agency attempting any collection activities against the Counter Plaintiff and Class Members.  Further, no person may claim ignorance of the law; rather all persons are presumed to know the law.

98. Due to its knowledge, as described above, Defendant had an appreciation that it was not entitled to receive the benefits they it collected from the Counter Plaintiff and Class members that flow from the void and illegal collection activities.

99. The acceptance and retention by Defendant of any sums received as a result of the illegal collection activities by it, directly or indirectly, against the Counter Plaintiff and Class Members under such circumstances is inequitable since Defendant did not have the legal right to even collect such payments in the first instance in the manner each sought to collect them—this conclusion is just and proper even though Defendant might have otherwise collected the alleged debts legally by obtaining a license.

WHEREFORE, Counter Plaintiff prays that the Court enter judgment

32

against the Defendant for the following:

a. Certify this case as a class action with the Counter Plaintiffs as class representative and her attorneys as counsel on behalf of the class members described herein;

b. Grant a money judgment and order the Defendant to disgorge and pay to the Class all judgment sums, costs, and pre- and post-judgment interest it has collected from the class members, directly or indirectly, related to the collection activities it conducted without the right to do so;

c. Award reasonable attorney's fees, litigation expenses and costs if allowed by law; and

d. Provide such other or further relief as the Court deems appropriate.

Respectfully Submitted,

Scott C. Borison, Esq.

Phillip R. Robinson, Esq., Of Counsel
Legg Law Firm, LLC.
5500 Buckeystown Pike
Frederick, Maryland 21703
(301) 620-1016; Fax: (301) 620-1018

### DEMAND FOR A JURY TRIAL

Pursuant to Rule 2-325(a), the Counter Plaintiff does hereby request a jury trial
for each of her claims asserted herein.

Phillip R. Robinson, Esq., Of Counsel
Legg Law Firm, LLC.
5500 Buckeystown Pike
Frederick, Maryland 21703
(301) 620-1016; Fax: (301) 620-1018

Attorney for Defendant/Counter Plaintiff

**CERTIFICATE OF SERVICE**

I certify that on March 5, 2013, I served a copy of the foregoing was sent by first class US prepaid mail upon:

Diane S. Rosenberg

7910 Woodmont Avenue, Suite 750

Bethesda, MD  20814

*Plaintiffs*

Robert Scott

Ballard Spahr LLP

300 E. Lombard Street

Baltimore, MD  21202

*Counsel for the Plaintiffs*

_____
Phillip R. Robinson